# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| WAG ACQUISITION, L.L.C., | Case No.: 14-cv-02832 (ES) (MAH) |
| Plaintiff, | |
| v. | |
| Gattyán Group S.à r.l., *et al.*, | |
| Defendants. | JURY TRIAL DEMANDED |

## PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.  INTRODUCTION..................................................................................... 1

II. LEGAL PRINCIPLES CONCERNING 35 U.S.C. § 112 ¶ 6 ........................... 1

III. DISPUTED CONSTRUCTIONS ...................................................................... 6

  1.  Item 1: "media data elements" ................................................................ 6

  2.  Item 2: "wherein the media data elements is sent at a rate that matches the
      constant fill rate of a server buffer, and is received at the same rate by the user
      computer" ............................................................................................ 9

  3.  Item 3: "interruptions" or "been interrupted"...................................... 11

  4.  Item 4: The "sending" limitation............................................................ 12

  5.  Item 5: "as said media player requires in order to maintain a sufficient number of
      media data elements in the media player for uninterrupted playback" ............... 14

  6.  Item 10: "repeat transmitting the requests to the media source for sequential
      media data elements so as to maintain the pre-determined number of media data
      elements in the player buffer until the last media data element comprising the
      program has been received." ............................................................... 15

  7.  Item 11: The "playback rate" limitation................................................. 16

  8.  Item 12: The "sending rate" limitation.................................................. 18

  9.  Item 13: "serial number / identifier" .................................................. 19

  10. Item 14: "user system being assumed to have a user buffer for receiving media
      data and facilities to play back the streaming media" ......................................... 20

  11. Item 15: "from a server assumed to be capable of sending streaming media
      elements at a rate more rapid than the rate at which said streaming media is
      played back by a user"........................................................................ 21

  12. Item 17: "about the playback rate"...................................................... 21

  13. Item 19: The "maintain" limitation ..................................................... 21

  14. Item 20: The user/player buffer limitations......................................... 23

  15. Item 21: The "filling" limitation.......................................................... 25

  16. Item 22: "server buffer"...................................................................... 27

IV. TERMS ALLEGED TO BE INDEFINITE AND SUBJECT TO 35 U.S.C.
    § 112, ¶ 6 .......................................................................................... 27

V.  CONCLUSION ....................................................................................... 30

## TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
  No. 1:10-cv-910 (LMB/JFA), 2018 WL 1699429 (E.D. Va. Apr. 6, 2018) ..................... 3

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
  830 F.3d 1341 (Fed. Cir. 2016) ....................................................................... 28

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) .................................................................. 3, 29

*Blackboard, Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) ....................................................................... 28

*Budde v. Harley-Davidson, Inc.*,
  250 F.3d 1369 (Fed. Cir. 2001) .................................................................. 2, 30

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) ....................................................................... 12

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
  673 F.3d 1361 (Fed. Cir. 2012) ....................................................................... 28

*Exxon Research & Engineering Co. v. United States*,
  265 F.3d 1371 (Fed. Cir. 2001) .................................................................. 5, 13

*Finisar Corp. v. DirecTV Grp., Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008) ................................................................ 3-4, 29

*In re Hiniker Co.*,
  150 F.3d 1362 (Fed. Cir. 1998) ....................................................................... 22

*Intel Corp. v. VIA Techs., Inc.*,
    319 F.3d 1357 (Fed. Cir. 2003).........................................................................5

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011).........................................................................4

*Linear Tech. Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004).........................................................................3

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    959 F.3d 1091 (Fed. Cir. 2020).......................................................................13

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
    75 F.3d 1545 (Fed. Cir. 1996).........................................................................21

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014).........................................................................................12

*Nevro Corp. v. Boston Sci. Corp.*,
    955 F.3d 35 (Fed. Cir. 2020)............................................................................5

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008).......................................................................16

*One-E-Way, Inc. v. Int'l Trade Comm'n*,
    859 F.3d 1059 (Fed. Cir. 2017).....................................................................5-6

*Personalized Media Commc'ns v. Int'l Trade Comm'n*,
    161 F.3d 696 (Fed. Cir. 1998)..........................................................................5

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...............................................13, 19

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985).......................................................................22

*Syncpoint Imaging, LLC v. Nintendo of Am. Inc.*,
  No. 2:15-cv-00247-JRG-RSP, 2016 WL 55118 (E.D. Tex. Jan. 5, 2016) ...................... 3

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
  831 F.2d 1017 (Fed. Cir. 1987)........................................................................... 23

*Tech. Licensing Corp. v. Videotek, Inc.*,
  545 F.3d 1316 (Fed. Cir. 2008).........................................................................4-5

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011)....................................................................... 4, 29

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) (*en banc*) ....................................................1-3

*Zeroclick, LLC v. Apple Inc.*,
  891 F.3d 1003 (Fed. Cir. 2018)........................................................................... 3

## Statutes

35 U.S.C. § 112...................................................................................................*passim*

## I.      INTRODUCTION

Defendant's proposed constructions are overly narrow and attempt to improperly import limitations from the specification into the Asserted Claims. Defendant further improperly attempts to take certain claim limitations within the gambit 35 U.S.C. § 112 ¶ 6, or "means-plus-function" construction, but the claims themselves recite adequate structure and are therefore not subject to such construction.

In this brief, WAG first outlines the law, primarily as it relates to 35 U.S.C. § 112 ¶ 6 and then discusses the disputed claim terms.

## II.     LEGAL PRINCIPLES CONCERNING 35 U.S.C. § 112 ¶ 6

"Means-plus-function" (MPF) under 35 U.S.C. § 112, ¶ 6 (now § 112(f)), a provision of patent law chronically over-argued by defendants, refers to a patent claim element that recites a claim to *any* "means" for performing a specified function. Claiming MPF comes with a strong, statutory caveat, limiting the claimed means for performing the function only to those specific means described in the specification. 35 U.S.C. § 112, ¶ 6 (a MPF claim element "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.").

Arguing MPF is popular with defendants because if a court should determine that a claim element is under MPF, and *then* further determine that the specification does not provide any corresponding structure, then no means are covered by the claim, and the claim is thus held indefinite, and invalid. *See*, *e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*). In other words, this series of findings amounts to sudden death for the patent claim in question and the defendant wins. Hence the popularity to defendants. But "a challenge to a claim containing a means-plus-function limitation as lacking structural support

1

requires a finding, by clear and convincing evidence." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376–77 (Fed. Cir. 2001).

The legal interpretations surrounding 35 U.S.C. § 112, ¶ 6 are as follows. There are two completely distinct levels to the analysis: first, whether the claim in question is a MPF claim at all, and second, if it is, whether the specification imparts sufficient structure to the means to render the claim with at least one interpretation for the means, and therefore not indefinite.

Thus, when a claim term uses the word "means," a rebuttable presumption arises that the term is a MPF term, falling under 35 U.S.C. § 112, ¶ 6. *Williamson*, 792 F.3d at 1348. Conversely, "the failure to use the word 'means' also creates a rebuttable presumption – this time that § 112, para. 6 does not apply." *Id*.

Under *Williamson*, the word "means" can be replaced by a similar type of placeholder word, called a "nonce" word. However, *Williamson* does *not* stand for the proposition that the mere use of a word that may be labelled a "nonce" word "generally" triggers means-plus-function treatment. *Williamson* actually holds that when "a claim term lacks the word 'means,' the presumption [*i.e.*, that § 112, para. 6 does not apply] can be overcome and § 112, para. 6 will apply only if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349 (internal quotations and citation omitted).

The MPF characterization does not apply at all if the claim language itself provides structure for the "means" or "nonce" word that may have also been used in the claim. If a claim recites a function, and follows that recitation within the claim, with a sufficiently definite recital of steps by which the function is carried out, then, under *Williamson* itself, the limitation should not be deemed a MPF limitation. In particular, the Federal Circuit has explained that a claim

2

limitation has sufficient structure to take it out of the regime of 35 U.S.C. § 112, ¶ 6 if it recites "a structural definition that is either provided in the specification or generally known in the art." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *see, e.g.*, *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018) ("program" and "code" are not necessarily nonce words and language following them provides adequate structure if a POSITA could reasonably discern it, rather than being abstract "black box recitations"); *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004) ("when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply"); *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, No. 1:10-cv-910 (LMB/JFA), 2018 WL 1699429, at *16-18 (E.D. Va. Apr. 6, 2018) (finding "computer code" conveys sufficient structure and collecting cases); *Syncpoint Imaging, LLC v. Nintendo of Am. Inc.*, No. 2:15-cv-00247-JRG-RSP, 2016 WL 55118, at *18-20 (E.D. Tex. Jan. 5, 2016) (collecting cases and finding "'processor...for...' language connotes sufficiently definite structure to one of ordinary skill in the art" so that § 112, ¶ 6 is inapplicable).

Once a term is determined to be MPF, construing it "is a two-step process. The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 792 F.3d at 1351 (internal citations omitted). For computer-implemented inventions, such as those at issue, corresponding "structure" for a claimed function is reflected in the recitation of an algorithm or procedure for performing the function. *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). Case law is clear that a stated algorithm can confer sufficient structure to avoid

a MPF characterization. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1317 (Fed. Cir. 2011).

In the case of a software-related invention, the "corresponding structure" consists of the algorithms disclosed in the specification, and in the case of a claim to a computer for carrying out the function, the corresponding structure is a computer programmed to implement an algorithm that performs the claimed function. *Finisar*, 523 F.3d at 1340. As a result, "the patent must disclose, at least to the satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary structure under § 112, ¶ 6." *Id*. In such cases, the "indefiniteness analysis does not turn on the name of the structure that does the processing." *In re Katz*, 639 F.3d at 1317. Instead, "[t]he key inquiry is whether one of ordinary skill in the art would understand the patent to disclose … an algorithm." *Id*. The Court should find a MPF limitation indefinite only "if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *AllVoice*, 504 F.3d at 1241 (citation omitted).

Further, "[f]or computer-implemented procedures, the computer code is not required to be included in the patent specification." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (citation omitted). Instead, the patentee may "express that procedural algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Id*. (internal quotations and citation omitted). Courts have held time and again that this disclosure need not be exhaustive to the last conceivable detail, since "the patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function." *Id.* (citation omitted); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338-39

(Fed. Cir. 2008) ("detector," which corresponded to claim limitation, and was illustrated in a figure as a "black box" without depicting its internal structure, did not constitute insufficient disclosure where evidence showed that technology to perform the function of the detector would have been known to a POSITA); *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003) (how to modify disclosed "core logic" on the circuitry level to perform claimed "Fast Write" may properly be left to the knowledge of those skilled in the art, and need not be specified in the patent).

Additionally, for any claim limitation, including those under § 112, ¶ 6, the issue of *indefiniteness* under 35 U.S.C. § 112, ¶ 2 is different from that of *enablement* under 35 U.S.C. 112, ¶ 1. *See, e.g.*, *Exxon Rsch. & Eng'g Co. v. United States*, 265 F.3d 1371, 1382 (Fed. Cir. 2001), *abrogated on other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) ("[T]here is no indefiniteness as to the scope of that limitation. The government's real objection to the claims as written is that they may include some inoperable embodiments…. However, that is an issue of enablement, and not indefiniteness.") (citation omitted); *Personalized Media Commc'ns v. Int'l Trade Comm'n*, 161 F.3d 696, 706 (Fed. Cir. 1998) (finding "digital detector" was not indefinite and any evidence thereof was only relevant to enablement).

For definiteness, "[c]laims, viewed in light of the specification and prosecution history, must 'inform those skilled in the art about the scope of the invention with reasonable certainty.'" *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 38-39 (Fed. Cir. 2020) (quoting *Nautilus*, 572 U.S. at 910). "This standard mandates clarity, while recognizing that absolute precision is unattainable." *Id.* (internal quotations and citations omitted) (finding "paresthesia-free" not indefinite). "As long as claim terms satisfy this test, relative terms and words of degree do not

render patent claims invalid." *One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1063

(Fed. Cir. 2017) (finding "virtually free from interference" not indefinite).

## III.     DISPUTED CONSTRUCTIONS

### 1. Item 1: "media data elements"

WAG does not believe that this term needs to be construed. Its meaning is plain: "media

data elements" are elements of media data. Since the media data arrives as a stream (*e.g.*, claim 1

of the '611 patent begins as a "method for distributing streaming media via a data

communications medium … the streaming media comprising a plurality of sequential media data

elements") it is logical to understand these elements as subdivisions of the media stream, without

any inherent connotations of size or length. *See* D.I. 273-5 (hereinafter "the '611 patent") at

15:55-58.

Duodecad's construction, by contrast, injects confusion into this term by appropriating a

technical term from the art (packets), which is used in other contexts. Duodecad correctly argues

that everything sent on the Internet is in packets. D.I. 272 (hereinafter "Duodecad Opening Br.")

at 7. That does not mean that every term regarding data sent over the Internet can be re-defined

as "packets." Duodecad also cites to the patent disclosure stating that playback can begin, in

some cases, after only a "single packet of media data" is received. *Id.* This passage, however,

does not define a media data element as a packet, and there are numerous places within the

specification where "media data element" is used. This passage specifically, and in

contradistinction, uses "single packet" of media data rather than "single element." Elements and

packets are two different concepts.

As explained in some detail in WAG's opening brief, Internet communication is viewed

as a construct of multiple logical layers, each layer abstracting away technical features from the

layer below it. *See* D.I. 274 at 8 (citing the Declaration of Keith Teruya ¶¶ 30-35 (D.I. 274-1)

(hereinafter "Teruya Opening Decl.")). The highest layer is the "application layer," and WAG's expert and Duodecad's expert both agree that "media data elements" are properly understood to be within the context of this application layer. *See, e.g.*, Ex. 1 at 28:10-12 ("[T]he specification in my opinion makes reference to application layer packets.") (hereinafter "Quackenbush Dep."), 34:7-9 ("[A] Packet in my construction is about an application layer packet, which would not be a transport layer or IP packet."); *see also* accompanying Declaration of Keith Teruya ¶ 9 (hereinafter "Teruya Rebuttal Decl.").

The term "packet," divorced from surrounding context, is more likely to be read by a POSITA as being within the context of the "transport" layer, which a POSITA would know is below the application layer and outside the scope of the Patents-in-Suit. *See* Teruya Rebuttal Decl. ¶¶ 4-5. In fact, WAG did not understand Duodecad's proposed definition from its opening brief and expert declaration. At deposition, Duodecad's expert made clear that Duodecad is proposing application layer packets. *See* Quackenbush Dep. at 34:7-9. Duodecad's definition is confusing and incorrect. It confuses the application layer of the network stack as envisioned by the Patents-in-Suit with the transport layer. Teruya Rebuttal Decl. ¶ 6. In particular, a transportation layer "packet" carries the implication of having a fixed or predetermined size, whereas the application layer independently determines the formats and sizes of application data, such as media data elements. *Id.* ¶ 7.[1]

---

[1] Based upon the examinations of both expert witnesses, it seems likely that Duodecad is seeking to take advantage on this "fixed size" connotation of packets, likely for non-infringement purposes. For example, Duodecad's counsel repeatedly sought to elicit deposition testimony from WAG's Plaintiff's expert, Mr. Teruya, about the length of a media data element. *E.g.*, Ex. 2 (hereinafter "Teruya Dep.") at 27:17-20 ("Q. What length does that media data element need to be to constitute a media data element? A. It doesn't have to have specific length because it's defined by its use, use and type."), 63:15-16 ("Q. So it's your testimony that a media data element can vary in length, correct?"). Defendant's expert, Dr. Quackenbush, affirmatively

In short, rather than providing clarity, Duodecad's "packet" construction does nothing more than inject ambiguity by way of a technical implication. Packets are used to encapsulate media data elements. *Id.* ¶¶ 4, 7. That does not mean that media data elements are packets. Duodecad's and Dr. Quackenbush's citations for factual support for their "packet" constructions rely almost exclusively on descriptions of the *transport layer* details, rather than the application layer that media data elements live in and thus are not *apropos*. *See id.* ¶¶ 8-14.

Finally, Duodecad makes the unfounded allegation that WAG's position on "media data element" has been inconsistent. According to Duodecad, "WAG ascribes two different meanings to 'media data elements' depending on whether the Asserted Claims relate to pulling streaming media from or pushing streaming media to the server," and cites to a portion of D.I. 212, noting WAG's statement that "TCP packets are the wrong packets —they are plainly not the 'media data elements' referenced in the Pull claims." Duodecad Opening Br. at 9 (citing D.I. 212 at 11). But this is *exactly* what WAG's position is and has *always* been. Duodecad did not even try to substantiate how WAG allegedly treats media data elements in the "push" patents. Duodecad simply seeks to muddy the waters with this argument.

The plain and ordinary meaning for this term should govern.

---

attempted to inject an inference about the size of his "application layer packets" in his deposition. Quackenbush Dep. at 35:25-36:6 ("Q Are application layer packets necessarily of a fixed size? A Packets are generic and that includes application layer packets, although in the context of these patents, I think we have some specific information about the length of these application layer packets."). There are no such arguments in Duodecad's opening brief concerning packet size, and even Dr. Quackenbush admitted that his application layer packets need **not have a fixed size**. *See id.* at 36:14-16 ("So you would agree they're **not necessarily a fixed size**? A I would agree, **yes**.") (emphasis added).

### 2. Item 2: *"wherein the media data elements is sent at a rate that matches the constant fill rate of a server buffer, and is received at the same rate by the user computer"*

Duodecad makes an unsupported assertion that "[t]he term 'rate' by itself does not provide a measure by which a factfinder can evaluate infringement." Duodecad Opening Br. at 10. Duodecad offers no evidence for this assertion – not even from its expert, Dr. Quackenbush.

In any event, the assertion is flatly contradicted by the plain language of the claims, which recite, "the user system being assumed to have a user buffer for receiving media data and facilities to play back the streaming media *at a playback rate* for viewing or listening by said at least one user, said method comprising: sending initial streaming media elements to the user system *at an initial sending rate more rapid than the playback rate*...." '611 patent, 15:59-65 (emphasis added). Clearly, at least "playback rate" is measurable since players are designed to play at that rate. There is no evidence to suggest (nor could there be) that "playback rate" is not measurable.

The instant limitation arises in a steady-state condition in which "the media data elements is [sic] sent at a rate that matches the constant fill rate of a server buffer, and is received at the same rate by the user computer if there are no interruptions in the transmission of media data between the server and the user's computer." *Id.*, 16:5-9. Clearly, if the media player is playing the streaming media at a *playback rate* as claimed, and as (for example) a live performance necessarily arrives at the server at the same *playback rate* (playback rate being what one sees in a normal rendition), then the "constant fill rate of a server buffer" must be the playback rate. WAG discussed this logical necessity in its opening brief at length (D.I. 274 at 10-12), and its position has remained consistent through all proceedings, as evidenced by Duodecad's citation to certain IPR proceedings touching on this issue. *See* Duodecad Opening Br. at 10-11.WAG's position is not based on "averaging" but WAG opposes Duodecad's proposed injection of a negative

limitation because it would itself introduce uncertainty insofar as digital data inherently consists of finite aggregates of data. Duodecad cites to two prior WAG arguments regarding averages. Duodecad's first cite is specifically about "*long term* averages," not *any* average. *Id.* at 11 (citing to IPR2016-01162, Paper 6 at 6-7 (D.I. 273-9)). As WAG argued, "In the long term, of course, everything at the server is sent and received by the client." *Id.* This does not mean all possible measurements over discrete units of time must be excluded. The other WAG argument cited by Duodecad is irrelevant to the rate matching limitation. *Id.* (citing to '141 Patent PTAB Oral Arg. Trans., 21:7-11 (Sep. 25, 2017) (D.I. 273-10)).[2]

Duodecad faults WAG's construction as "improperly attempt[ing] to import 'playback rate' into the construction." Duodecad Opening Br. at 11. Yet, WAG's construction, relying upon "playback rate," is directly present in the language of the claims themselves and interrelates with the sending and receiving rates in the instant clause. The unit of the rate is the same throughout. Duodecad's "bits of the media data elements per unit time" construction, by contrast, finds no support in the claims and instead is pulled from the specification, under an unsubstantiated excuse that "rate" cannot otherwise be measured.[3]

---

[2] This distinction argued by WAG was in the context of the '141 patent, which WAG argued required each media data element to be sent faster than the playback rate and that this speed requirement, for each element, could not be met by the aggregate speed of multiple elements sent over multiple channels (*see* D.I. 273-10 at 20:7-8 (arguing, in the same exchange at oral argument as Duodecad's quote, the distinction of "the aggregate data rate as opposed to the rate of individual elements")). It is unclear if the use of the word "averages" at oral argument was intended, when the argument was actually about "aggregate." Note that "aggregate" appears 11 times in the argument transcript, whereas "average" appears only this once.

[3] Further, a POSITA would understand that the "bit rate" language Duodecad has cherrypicked from the specification is more properly understood within the context of the transport layer and not the application layer that all parties appear to agree is the subject matter of the claims. *See* Teruya Dep. at 54:12-21 ("A. This is that a media -- a physical network transport media discussion about how many bits per second the internet channel is. We're not talking about media movement here. We're talking about the maximum rate at which the media could move at

The plain and ordinary meaning of this limitation is clear and requires no construction.

### 3. Item 3: "interruptions" or "been interrupted"

Duodecad makes much of language in the intrinsic record reciting "delays and interruptions" and the like, stating that such language shows that there is some kind of difference between a "delay" and an "interruption," and then somehow uses this alleged difference as an argument to swap out "interruptions" for an entirely new term, "dropout."

But Duodecad never explains what the purported difference is between "interruptions" as used in the claims and "delays" as used in passing reference – probably because there is no real difference. A delay in data transmission is a form of interruption. Hence, there is no need to fret over the alleged difference between the two, and thus certainly no need to use wholly different language of "dropout" as Duodecad would have it.

An interruption in the "transmission" of data, as recited in the claims of both the '611 and the '839 patents, would not necessarily yield an interruption in the viewing/listening perceptible to the user, as Duodecad urges. In fact, the patent specification recites, in different places, interruption in "transmission" (*e.g.*, '611 patent, 4:62-64, 5:66-6:3) which is what is recited in the claim element here, and interruptions in playback (*e.g.*, *id.*, 2:33-34, 4:18-21), which is what Duodecad is trying to force on this claim language. As made clear by the specification, "Data lost due to interruptions in the receipt of media data by the media player can be recovered while the player continues to play out the audio or video material." *Id.*, 5:66-6:1. This allows there to be an interruption in transmission, as recited in the claim, without an interruption in *playback* perceptible to the user. Only in some cases, where the interruption is "severe," depleting the

---

this -- by these definitions of bit rates way down at the Ethernet or transport media level, not the media at the upper levels of frame rates for video or anything like that.").

user's buffer, will the playout stop (*id.*, 6:1-3), in which case it *would* be perceptible to the user. Duodecad is trying to limit this claim term to the severe case, when it is clearly broader and does not require any perceptible change to the viewer.

The plain and ordinary meaning of "interruption" should govern.

### 4. Item 4: The "sending" limitation

A.    *"sending/send [the initial] streaming media elements to the user system at an initial sending rate / a sending rate more rapid than the playback rate, to fill the user buffer; and configuring the initial streaming media elements so that the amount of said initial elements, and said initial elements, and said initial sending rate, are sufficient for the user system to begin playing back the streaming media while the user buffer continues to fill"*

B.    *"sending an initial amount of streaming media data elements to the user system at an initial sending rate more rapid than the playback rate...the initial amount of streaming media data elements, and the initial sending rate, are sufficient for the user system to begin playing back the streaming media while the user buffer continues to fill"*

Duodecad's entire indefiniteness argument hinges upon the alleged ambiguity of "sufficient" within the context of this limitation. *See* Duodecad Opening Br. at 13-14. The remarkable thing about this argument is that it proves the contrary: the term "sufficient" is clearly defined by the claim language itself.[4]

According to Duodecad, "[t]he claim language requires that the sufficiency depends on two parameters (amount of initial elements and initial sending rate) to produce two results - (a) to begin playing the media while (b) the user buffer continues to fill." *Id.* Hence, even Duodecad agrees that the objective test for "sufficient" resides in the determination of parameters (a) and (b) above. Yet, there is *no evidence*, not even from Dr. Quackenbush, that these two parameters

---

[4] Further, Duodecad relies on *Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371 (Fed. Cir. 2001) and *repeatedly* relies on *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005), both of which have been abrogated by the Supreme Court's decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014).

themselves are indefinite. In fact, the unrebutted factual record demonstrates that a POSITA can readily determine "sufficiency" on this basis. *See* Teruya Rebuttal Decl. ¶¶ 21-23. A POSITA can easily determine if the "streaming media data elements" are sufficient to (a) begin playing media while (b) the buffer continues to fill. Each of these is a simple, bright-line test. Nothing more is required for definiteness under 35 U.S.C. § 112, ¶ 2.

Duodecad's arguments ring not in indefiniteness but enablement under 35 U.S.C. § 112, ¶ 1: "none of the claims, specification or prosecution history explains *what a permissible range* of the initial amount of data elements and initial sending rate should be in order to be 'sufficient.'" Duodecad Opening Br. at 14 (emphasis added). But Duodecad is not arguing that the claims are not enabled, and even if it were, it has advanced no evidence in support of this proposition. The test for enablement is "undue experimentation" under the so-called *Wands* factors. *See, e.g.*, *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1100 (Fed. Cir. 2020). Not even Dr. Quackenbush has alleged that determining the bounds of "sufficient" would require undue experimentation (*see* D.I. 272-2 (hereinafter "Quackenbush Opening Decl.") ¶¶ 81-87), and Mr. Teruya has opined exactly the opposite. *See* Teruya Rebuttal Decl. ¶ 24.

Duodecad's arguments to extrinsic evidence[5] is similarly unavailing. Duodecad cites to a portion of the deposition testimony of the inventor, Mr. Price, in which Mr. Price stated "[t]he server buffer does not know. Doesn't care," concerning sufficiency of the initial amount of streaming media data elements. *See* Duodecad Opening Br. at 14 (quoting Price Dep. at 162:24) (D.I. 272-6) (hereinafter "Price Dep."). But this is misleading, since it is clear that Mr. Price was

---

[5] Of course, extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*)

considering sufficiency from the standpoint of the *player*, not the server, and it is the player that knows whether or not it has enough data to begin playing:

> Q. So the server doesn't need to have any knowledge of the user buffer in the context of this?
>
> A. *In the context of when the user's going to start playing the audio*, that's correct.

Price Dep. 162:25-163:4 (emphasis added). This is perfectly logical. The server doesn't care *when* the player begins to start playing; it only knows that it has enough media data buffered to ensure that the player *can* start playing. *See also* Teruya Rebuttal Decl. ¶ 24 (explaining how this "sufficient" amount of media data elements can be readily determined).

WAG has previously explained why Duodecad's proposed alternative construction is defective (D.I. 274 at 15-17) and for those reasons the plain and ordinary meaning should govern.

### 5. Item 5: "as said media player requires in order to maintain a sufficient number of media data elements in the media player for uninterrupted playback"

According to Duodecad, "[t]his limitation, while pertaining to claims 1 and 24 of the '141 Patent, suffers the same fate as the 'sufficient' limitation discussed above with respect to the '611 and '839 Patents." Duodecad Opening Br. at 14. Duodecad's argument fails for the same reason as well.

Like sufficiency discussed above, the test for "sufficient" in this limitation is a simple, bright-line test: are there enough media data elements "in the media player for uninterrupted playback"? This is easy to determine: are there interruptions or not? If not, then the number is sufficient – full stop. There is no ambiguity.

Instead, Duodecad once again confuses indefiniteness with enablement, but advances zero evidence to support the proposition that a POSITA would need to conduct *undue experimentation* to determine what is a sufficient amount of media data elements "for

14

uninterrupted playback," while Mr. Teruya has indicated that it can be quite easily determined. *See* Teruya Rebuttal Decl. ¶ 24.

As WAG has previously explained why Duodecad's proposed alternative construction is defective, the plain and ordinary meaning should govern.

### 6. Item 10: "repeat transmitting the requests to the media source for sequential media data elements so as to maintain the pre-determined number of media data elements in the player buffer until the last media data element comprising the program has been received."

Duodecad offers almost no justification for its rewriting of this claim language, and for this reason alone its proposed construction should be abandoned for the plain and ordinary meaning.

For example, Duodecad states that it "seeks to clarify what the predetermined number is – namely, a specific number set prior to connecting to the server," but never attempts to justify why "predetermined" must necessarily be "set prior to connecting to the server" instead of set at some other event. Duodecad Opening Br. at 22. Duodecad's own expert testified that "predetermined" means "determined in advance of another situation or criteria." *See* Quackenbush Dep. at 56:11-15 ("Q So how do you understand the term 'predetermined'? A Well, it is something that is determined in advance of another situation or criteria."). There is no reason proffered to justify why this broad term must be more narrowly construed to the criteria of being set "prior to connecting to the server," as Duodecad would have it.

Tellingly, the evidence that Duodecad advances in support of its construction counsels against its very adoption in this case. Dr. Quackenbush noted that Mr. Price provided various examples of what a POSITA would consider when determining sufficiency of media data elements for playback, including "the device, the playback speed, the kind of media that you're sending." Quackenbush Opening Decl. ¶ 77 (quoting Price Dep. at 164:12-166:20). Yet, as Mr.

Teruya explains, "[s]ome of these factors may only be known after connecting to the media source (such as media type). Hence, a POSITA would understand that the 'predetermined' number of media data elements could be determined after connection to the network and after connection to the media source." Teruya Rebuttal Decl. ¶ 34.

As for its justification for rewriting "the pre-determined number of media data elements" to read as "the same number of media data elements," all Duodecad can point to is an excerpt from the '011 patent that discusses an embodiment in which the buffer level remains constant (*see* Duodecad Opening Br. at 22 (citing D.I. 273-15 at 3:4-8) (hereinafter the "'011 patent")), and arguments made during an IPR (*see id.*). But Duodecad offers no reason why language concerning an embodiment in the specification must be imported into the claims and does not adopt the language used in the IPR in any case. *See* Duodecad Opening Br. at 22 (quoting IPR language stating "in a manner so as to maintain a specified player buffer fullness" while purported construction recites "the same number of media data elements"). Nothing in the patent itself or its prosecution history rises to a clear disclaimer of scope that would be needed to justify Duodecad's construction position. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) (absent clear disclaimer in the specification or prosecution history, it is improper to "interpret claim terms in a way that excludes embodiments disclosed in the specification"). The plain and ordinary meaning of this term should instead be adopted.

### 7. *Item 11: The "playback rate" limitation*

A.     *"playback rate for viewing or listening by said at least one user"*
B.     *"the rate at which said streaming media is played back by a user"*
C.     *"rate at which the media data elements are to be played out by the media player"*

Duodecad seeks to throw a monkey wrench into the claims by introducing limitations out-of-the blue for no reason other than to manufacture a noninfringement defense. It attempts to rewrite simple terms without any justification. The *only* citation to the patents that Duodecad

relies upon that even references bitrate (*i.e.*, bits per unit time as Duodecad would have it) is in a section discussing transport layer bandwidth capabilities for uninterrupted streaming, and thus is not equivalent to (or is a subset of) the application layer "playback rate." *See* Duodecad Opening Br. at 23 (citing D.I. 273-6 at 1:63-66) (hereinafter the "'141 patent")). Yet, as discussed exhaustively elsewhere, both WAG and Duodecad understand that the claims are directed to the application layer, not the transport layer. Every other citation Duodecad relies upon actually supports WAG's construction or is at least neutral. *See id.* (bulleted citations and following).

As with the other "rate" limitations, Duodecad begins its argument with the unsupported assertion that "the term 'rate' by itself does not provide a measure by which a factfinder can evaluate infringement." *Id.* at 23. Duodecad advances zero evidence in support of this assertion, whereas common sense suggests that a "playback rate" can clearly be measured, since all players playback media and they do not do so in a random manner. For this reason alone the Court should abandon Duodecad's construction in favor of the plain and ordinary meaning.

Moreover, Duodecad's allegation that "WAG's proposed construction of playing out media 'in a normal rendition' finds no support within the Asserted Patents," is simply disingenuous. *Id.* at 24. By way of example, the '611 patent discloses: "[i]n conventional systems for streaming media over the Internet, media data (whether real-time or file based) is simply transmitted from the server to the user at the rate at which it will be played out (the 'playback rate'), regardless of the data rate capabilities of the connection between the server and the user." '611 patent, 5:36-42. This is exactly the import of WAG's exemplary language. Another notable aspect of this excerpt is that it clearly distinguishes between "data rate capabilities of the connection between the server and the user," that is, transport layer details as present in

Duodecad's construction, and the playback that the user sees, that is, the application layer "playback rate," thus further highlighting Duodecad's faulty construction.

The Court should adopt the plain and ordinary meanings of these simple terms.

### 8. Item 12: The "sending rate" limitation

    A.      *"sending rate"*
    B.      *"send[] … at … rate"*

Duodecad's statement that "Defendant's construction amplifies how rates are measured in the data transfer context. In contrast, WAG's construction adds nothing," is actually a good point if one understands what "amplifies" means: unduly limits. Duodecad Opening Br. at 25. And, of course, this quote shows that Duodecad is seeking to again inject transport layer technicalities into claims directed to application layer functionality.

In justifying why the technicalities of "bits per unit time" must be injected into this term, Duodecad states that "[d]efining 'rate' in an objective measure of bits over time will assist the factfinder in making a rate assessment when comparing sending rates to playback rates." *Id*. at 24. But Duodecad never explains why a fact finder cannot just compare the sending rate to the playback rate, rather than being forced to analyze transport layer details of bitrates. Nor does Duodecad explain away the disclosure in the specification that "[t]he server buffer 14 'sends' data by delivering it to the transport mechanism," indicating that the sending rate is something other than (or at least a superset of) the underlying transport layer bit rate. '611 patent, 8:14-15. As for Duodecad's citation to arguments made in an IPR, the quote relied upon compares sending rate to playback rate, with an ancillary note that the underlying transport mechanism must be able to support transmissions faster than the playback rate; nothing about this forces the conclusion that the sending rate must be a bit rate.

In short, Duodecad has pointed to no evidence in the intrinsic record to limit the sending rate to only a bit rate and thus its construction should be ignored in favor of the plain and ordinary meaning of these terms.

### 9. Item 13: "serial number / identifier"

Nothing in the plain language of these two terms requires them to be either consecutive or limited to numerals, as argued in WAG's opening brief. *See* D.I. 274 at 22-23. Serial items indicate a series and requiring them to be consecutive would render superfluous claim 2 of the '141 patent. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Just because there is a "series" of serial numbers / identifiers does not mean that they must be consecutive. Non-consecutive numbers can represent a series.

Duodecad's references to WAG's arguments made in IPRs are inapposite. WAG did not argue that systems using pre-existing identifiers were excluded from the "claims of the Asserted Patents." Duodecad Opening Br. at 25 (citing IPR 2015-01037, Paper 6 at 30 (D.I. 273-14)). This argument was not related to all of the claims of the Asserted Patents, but was directed to claims 19-23 of the '141 Patent, which specifically recite a routine to "serially identify" sequential data elements, *i.e.*, the act of identifying them. These claims are no longer asserted in this case. IPR 2015-01037, Paper 6 (D.I. 273-14) at 30 (heading above Duodecad's quote, ending in "Claims 19-23."). WAG also never argued that the "identifier" in claims 1 and 24 of the '141 Patent is a "serial number" as Duodecad argues. *See* Duodecad Opening Br. at 25 (citing IPR 2015-01037, Paper 6 (D.I. 273-14) at 40-42). The asserted prior art included "serial numbers" and WAG was distinguishing these from the identifiers of the claims using the terminology of the asserted art itself.

Moreover, Duodecad tries to conflate the fact that the media data elements themselves are "sequential" with some requirements that the identifiers themselves are consecutive. The series of the identifiers / numbers *corresponds* to a sequence. That sequence is the multimedia data itself. All multimedia data is sequential because music and video has an order, such that you perceive the notes or images in the proper order and not scrambled. The media data elements are sequential. The identifiers / numbers are in a series that identifies that sequence, but the identifiers / numbers are not themselves necessarily in a sequence or consecutive, they are merely in a defined series so that they correspond to the sequence of the multimedia data elements.

Finally, Duodecad's cite to the Oxford Dictionary (Duodecad Opening Br. at 26 (citing COMMON000169814, D.I. 273-19)) shows that WAG's definition is correct. An item that shows a position in a series is perfectly in-line with identifiers that correspond to a sequence. This definition in no way supports the more limiting "consecutive." It suggests just the opposite – that the identifiers / numbers need <u>not</u> be consecutive.

### 10. Item 14: "user system being assumed to have a user buffer for receiving media data and facilities to play back the streaming media"

Duodecad argues, based on dictionary definitions, that this clause from the claim preambles must be a specific, and negative limitation on the steps that the overall system takes. It is not so. As argued in WAG's opening brief (D.I. 274 at 24-25), this term merely means that the system is constructed under the assumption that the user system has a buffer with the stated properties. An actual check for the buffer, whether direct or indirect, is neither included or excluded from the claim itself and, as argued in WAG's opening brief, some disclosures actually include a check for a buffer. *Id.*

***11.***      ***Item 15: "from a server assumed to be capable of sending streaming media elements at a rate more rapid than the rate at which said streaming media is played back by a user"***

As with Item 14 above, there is no specific negative requirement in this language.

***12.***      ***Item 17: "about the playback rate"***

The Parties nearly agree with the construction of this term, except that Duodecad, again, insists upon inserting the further limitation that "'rate' cannot be met/measured using aggregates or averages," which is pure surplusage that finds no support in the claim language itself or in the specification. As discussed above in relation to Item 2, WAG's prior arguments regarding averages are not applicable. One went to "long term averages" and the other was not actually an argument about averages, but rather about an "aggregate."

The Court should thus adopt the plain meaning for this term, *e.g.*, at approximately the playback rate, which is the rate at which the media will be played out in a normal rendition. *See Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1554 (Fed. Cir. 1996), *abrogated on other grounds by Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000) (terms such "as 'about' must be given reasonable scope … [and] viewed by the decisionmaker as they would be understood by persons experienced in the field of the invention").

***13.***      ***Item 19: The "maintain" limitation***

     *A.*      *"media player software comprising…instructions to implement a player buffer manager…operable to maintain a record of the serial number of the last media data element that has been received and stored in the player buffer"*

     *B.*      *"software being programmed to cause the media player to maintain a record of the identifier of the last data element that has been received"*

21

C.      *"computer program for use in operating a media player...comprising: a routine that maintains a record of the identifier of the last sequential media data element that has been received by said player"*

As WAG noted in its opening brief, Duodecad's construction improperly and unabashedly reads operative characteristics of the invention into the claim language. *See In re Hiniker Co.*, 150 F.3d 1362, 1368 (Fed. Cir. 1998) ("Although operational characteristics of an apparatus may be apparent from the specification, we will not read such characteristics into the claims when they cannot be fairly connected to the structure recited in the claims.").

In particular, Duodecad reads in both "in a memory separate from the player buffer," and "in order to request transmission of a next sequential media data element." Duodecad's justifications for this surplusage is sorely lacking.

In the first instance, Duodecad does not even attempt to explain why the "in a memory separate from the player buffer" language is in any way appropriate; it simply is not discussed at all. *See* Duodecad Opening Br. at 30-31. Such unjustified constructions should be ignored.

As for the second item of surplusage, Duodecad's first justification amounts to little more than "because that's how the invention works." *See id*. How embodiments of the invention work is irrelevant, however, to what is claimed. *In re Hiniker Co.*, 150 F.3d at 1368. It is black letter law that not every feature disclosed in the specification need be found in the claims. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("[I]f structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims.").

Duodecad's second justification is disingenuous, as it draws on arguments made in an IPR that were directed to claim 24 of the '141 patent. In particular, that claim recites "a routine that requests transmission of the next sequential media data elements *following said last sequential media data element*, as said media player requires in order to maintain a sufficient

number of media data elements in the media player for uninterrupted playback," a limitation that is not found in claim 1 of the '141 patent or in any of the claims in the '011 patent. '141 patent, 15:18-16:3 (emphasis added). Hence, Duodecad would have the Court read a limitation from one claim into two other claims that do not have this limitation, rendering *the lack of this limitation* superfluous. Simply on the claim differentiation doctrine alone this cannot be proper or correct. *See Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant.").

### 14. *Item 20: The user/player buffer limitations*

A.      *"user buffer"*
B.      *"player buffer"*

Duodecad does not explain why the redundant surplusage of "for storing media data elements" is a necessary component of these two limitations. The claims of the '611 patent make it explicit that the user buffer is "for receiving media data." *E.g.*, '611 patent, 15:60. There is no need to repeat this claimed aspect of the invention.

More problematic is that Duodecad does not even try to explain where the "incorporated in the user media player software" language comes from. All that Duodecad has on this point is a reference to its arguments with respect to "server buffer." *See* Duodecad Opening Br. at 32. But those arguments discuss an "application layer buffer," which is not the language proposed here and thus off base.

Given the repetition of claimed features and the failure to articulate a basis for this surplusage, the Court should simply adopt the plain and ordinary meaning for these simple terms.

C.        *"player buffer manager"*

Duodecad faults WAG's construction of this term as "merely reus[ing] words of claim 1 of the '011 Patent without providing any clarity." Duodecad Opening Br. at 32. Duodecad's construction, however, is far worse in so far as it *repeats* words present in claim 1 while injecting contradiction.

The language in claim 1 of the '011 patent concerning the player buffer manager recites "instructions to implement a player buffer manager, for managing a player buffer established in the memory*, operable to maintain a record of the serial number of the last media data element that has been received and stored in the player buffer*." '011 Patent, 14:1-5 (emphasis added). There is no reason to repeat this emphasized language in the construction of "player buffer manager" as Duodecad does.

Duodecad's justifications for the surplusage of "a distinctly identifiable unit of the media player" goes off the rails in that it ignores the language of claim 1 as a whole. Claim 1 recites "media player software comprising" various instructions, including instructions to implement the player buffer manager. *See* '011 patent, 13:22. Hence, the player buffer manager is a portion of a larger piece of software as a whole – the "media player software." Duodecad would have this portion of software be "a distinctly identifiable unit" for no greater reason than because it is recited in the claims and described in the specification – which begs the question of how one could go about doing so without triggering Duodecad's "distinctly identifiable unit" surplusage, whatever that means.

Duodecad applies the same logic to justify its language of "memory separate from the player buffer" and is deficient then for the same reasons. But, further, Duodecad does not attempt to justify the logical impossibility of the serial number being stored "in a memory separate from the player buffer" as Duodecad would have it. Claim 1 recites "a memory" as part of the media

24

player device. *See* '011 patent, 13:20. The claim then recites instructions to "store the media data elements in *the memory*" (*id.*, 13:28-29 (emphasis added)), and that the "player buffer [is] established in *the memory*, operable to maintain a record of the serial number of the last media data element that has been received." *Id.*, 14:2-4 (emphasis added). *The same memory* is being used for both purposes under the plain meaning of claim 1. Duodecad does not attempt to explain how the structure of claim 1 can be twisted to require a "memory separate from the player buffer" for storing a serial number when both are recited as being part of "*the* memory."

Given the internal contradictions in, and repetitiveness of, Duodecad's construction, the Court should simply adopt the plain and ordinary meaning of this term, as proposed by WAG.

### 15.    Item 21: The "filling" limitation

#### A.    *"to fill the user buffer"*

Duodecad's indefiniteness argument appears to be founded upon fundamental misunderstandings of the technology disclosed in the '611 patent. Duodecad argues that the sending rate of the server changes "after the user buffer has been filled" which it argues "cannot happen without the server determining the 'user buffer has been filled.'" Duodecad Opening Br. at 34 (internal citations omitted). This is simply wrong – the server never needs to determine anything about the state of the user buffer.

Fundamentally, "*[a]ll* media data to be delivered to a user computer may be sent at a higher than playback rate," regardless of whether it is the initial burst of data or the data in the steady state condition. '611 patent, 8:31-32 (emphasis added). Initially, the server buffer stores a predetermined amount of media data, such as 30 second's worth. *See id.*, 7:43-52. The server sends all of this stored data as fast as the transport mechanism will allow when the user first connects, which allows the player to immediately begin playing as the user buffer fills. *See id.*, 7:55-58; 8:40-46. Thereafter, the "steady state condition is reached wherein as each media data

element arrives at server 12, it is immediately sent out to the user computer." *Id.*, 7:63-65. But, as noted, the server sends all data as fast as it can. The "steady state" condition occurs because the server receives new data from the source (such as a video camera) at the rate it is generated – the playback rate. *See id.*, 7:65-8:8. The server never need concern itself with how full the user buffer is.

As a result, Duodecad's block quote to a portion of the specification concerning the steady state condition (Duodecad Opening Br. at 34) is simply irrelevant to the "filling" limitation. The fact is, even in the steady state condition, the user buffer need not be "full" – together, the server and user buffers provide "an elastic system" that stores a predetermined amount of data *between them*. *See* '611 patent, 8:47-56. It is this elasticity that provides resilience to network interruptions.

Compounding its errors, Duodecad makes the unsubstantiated claim that "a POSA cannot understand the scope of, *e.g.*, 'filled' or 'fill' with reasonable certainty." Duodecad Opening Br. at 33. The record establishes, however, that a POSITA can easily determine what it means "to fill the user buffer." *See* Teruya Rebuttal Decl. ¶¶ 41-43. In fact, based upon the example given in 9:34-43 of the '611 patent, a POSITA would readily understand that "to fill the user buffer" means to fill to the level reached after the initial burst of data, as proffered by WAG. *See id.* ¶ 42.

Like its earlier "indefiniteness" arguments, Duodecad's arguments here ring in the different issue of enablement. *See* Duodecad Opening Br. at 33 ("[T]here are no bounds on the volume of such 'initial streaming media elements.' Further, multiple factors control the fill level of the buffer."). But, as above, such arguments are without any supporting evidence concerning undue experimentation.

26

As WAG has previously explained why Duodecad's proposed alternative construction is defective, the plain and ordinary meaning should govern.

      *B.*      *"after the user buffer has been filled"*

As discussed above, Duodecad's arguments are premised upon unsubstantiated factual allegations and a faulty understanding of the disclosed technology. As a result, its construction employing, *inter alia*, "in response to a determination by the server," and "is equal to the size of the user buffer," is simply wrong and must be passed over for the plain and ordinary meaning.

      **16.**      **Item 22: "server buffer"**

WAG agrees with Duodecad that the "server buffer" is not a transport layer buffer. As explained in its Opening Brief, WAG's concern is that, although the server buffer may be *created* by application layer software, the server buffer may not be *at* the application layer itself, as Duodecad would have it. In short, Duodecad's construction is unduly hyper-technical for such a simple term, and plain and ordinary meaning should govern.

## IV.   TERMS ALLEGED TO BE INDEFINITE AND SUBJECT TO 35 U.S.C. § 112, ¶ 6

In pages 16 to 21 of its Opening Brief, Duodecad alleges that certain claim terms in the Patents-in-Suit are subject to 35 U.S.C. § 112, ¶ 6 and on that basis are indefinite. In each case, the underlying argument follows a formulaic procedure and consequently all such terms can be addressed *en masse*.

Duodecad's formula proceeds as follows: identify the terms "computer program," "routine," or "instructions" as nonce terms triggering 35 U.S.C. § 112, ¶ 6; assert that the language following these terms is purely functional; and then cite to portions of Dr. Quackenbush's declaration as allegedly supporting these assertions. Duodecad's arguments fail,

however, because (a) they fundamentally misunderstand the law governing the application of 35 U.S.C. § 112, ¶ 6, and (b) Dr. Quackenbush does not say what Duodecad alleges in its brief.

Concerning (a), the cases that Duodecad cites are all distinguishable. *Blackboard, Inc. v. Desire2Learn, Inc.*, evaluated a claim that recited a "means for assigning a level of access." 574 F.3d 1371, 1382 (Fed. Cir. 2009). The claim was clearly MPF and the court evaluated the specification for structure and, in arguing the matter, the attorney for the patentee argued that the means was an "access control manager," a black box, which was not even defined as either software or hardware. *Id.* at 1382-83. Further, the attorney tautologically argued that "the access control manager manages access control." *Id.* at 1383. As the Federal Circuit characterized the argument, Blackboard argued that this access control manager was "any computer-related device or program that performs the function of access control." *Id.* This sort of black box access control manager and lack of specificity of its function was insufficient for corresponding specification structural support for a clear MPF limitation. There was nothing like the instant case where the claim itself recites sufficient structure, well beyond this sort of undefined black box.

Duodecad completely mis-cites *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, which does not have any "module," in the claim language, as argued by Duodecad, but rather recites a similar sort of black box "symbol generator" that was found to be indefinite. 830 F.3d 1341, 1347-50 (Fed. Cir. 2016). *Ergo Licensing, LLC v. CareFusion 303, Inc.*, which Duodecad cites repeatedly for its quote about a "step-by-step procedure," is distinguishable, because in *Ergo*, the patentee argued that the corresponding structure for the "control means" of the claims was merely the two repeated words "control device" in the specification. 673 F.3d 1361, 1363 (Fed.

28

Cir. 2012). None of these cases come close to WAG's algorithms, recited within the claims themselves, as well as in the specification.

As for (b), it is significant that, in each instance, Dr. Quackenbush recognizes that the claim language after the nonce term is a computer-implemented function. *See, e.g.*, Quackenbush Opening Decl. ¶¶ 89, 98, 106. Dr. Quackenbush then opines that the respective *nonce term* does not provide sufficient structure for this recited computer-implemented function. *See, e.g.*, *id.* ¶¶ 91, 100, 108. Of course, the legal question is not whether a nonce term can have sufficient structure (it cannot), but whether *the language after it conveys sufficient structure*. *See Finisar*, 523 F.3d at 1340; *Apple Inc. v. Motorola, Inc.*, 757 F.3d at 1299. Dr. Quackenbush, however, does not address whether or not a POSITA would understand the computer-implemented function recited after the nonce term to convey sufficient structure, *e.g.*, an algorithm. He is entirely silent on this critical issue.

Mr. Teruya unequivocally states, by contrast, that each computer-implemented function recited in the claims would be clearly understandable to a POSITA as an algorithm and, moreover, a POSITA could readily implement such algorithm. *See* Teruya Rebuttal Decl. ¶¶ 25-33; *see also Typhoon Touch*, 659 F.3d at 1385-86 (the algorithm may be expressed in any understandable terms to a POSITA). Duodecad has advanced no evidence to the contrary. Hence, under *Finisar*, the claim language itself in each instance recites sufficient structure that takes it out of the ambit of 35 U.S.C. § 112, ¶ 6.

Further, even if the Court were to find the claims subject to § 112, ¶ 6, the specification of each patent provides ample disclosure of the algorithms corresponding to these functions in a manner that a POSITA could easily implement. *E.g.*, '141 patent, 8:42-9:12; '011 patent, 8:25-9:2; Teruya Rebuttal Decl. ¶¶ 25-33. It is Defendant's burden, by clear and convincing evidence,

to show a lack of corresponding structure (*Budde*, 250 F.3d at 1376–77), and Defendant has failed to meet this burden.

**V.      CONCLUSION**

For the forgoing reasons, the Court should construe each of the above-noted limitations to have its plain and ordinary meaning, which interpretation is consistent with the internal language of the claims themselves and the specification.


Dated: March 4, 2021


/s Ronald Abramson
Ronald Abramson
David G. Liston
Ari J. Jaffess
M. Michael Lewis
Alex G. Patchen (*Pro Hac Vice*)
**Liston Abramson LLP**
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, New York 10174
Tel.: (212) 257-1630

*Attorneys for Plaintiff*
*WAG Acquisition, L.L.C.*

**CERTIFICATE OF SERVICE**

On this 4th day of March, 2021, I certify that I caused a copy of Plaintiff WAG

Acquisition, L.L.C.'s Responsive Claim Construction Brief to be served upon counsel of record

for Defendant via ECF.

Dated: March 4, 2021

    *s/* Ronald Abramson